Filed 3/13/24  In re F.F. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re F.F., et al., Persons Coming Under the Juvenile Court Law. | B330794 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.C., et al. <br><br> Defendants and Appellants. | (Los Angeles County Super. Ct. No. 21CCJP02156CD) |

APPEAL from orders of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Judge Pro Tempore.  Affirmed.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant A.C.

Law Offices of Vincent W. Davis & Associates and Vincent W. Davis for Defendant and Appellant F.M.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

A.C. (Mother) and F.F.M. (Father) are the parents of F.F., born in 2019, and J.F., born in 2021 (collectively, Minors).[1] The juvenile court assumed jurisdiction over Minors based on Mother and Father's substance abuse and ultimately terminated Mother and Father's parental rights. In this appeal from the parental rights termination order, we are principally asked to decide whether the trial court erred in summarily denying Father's changed circumstances petition and in finding the parents did not establish the parental benefit exception applied to law otherwise requiring termination of their parental rights.

## I. BACKGROUND

### A. *Investigation and Assumption of Dependency Jurisdiction*

J.F. was born in March 2021. Her meconium tested positive for amphetamines. As hospital staff explained to a social worker with the Los Angeles County Department of Children and Family Services (the Department), this test indicated Mother used drugs in the second or third trimester of her pregnancy.

After the positive drug screening at J.F.'s birth, a Department social worker interviewed Mother and Father.

---

[1] Both parents have additional children, and two of Mother's older children were involved in these dependency proceedings. Because Mother joins Father's arguments without raising any separate issues, this appeal concerns only F.F. and J.F.

Mother disclosed she had a history of substance abuse. She stopped using drugs years earlier, but relapsed in early 2020. She claimed, however, that she did not use drugs during her pregnancy with J.F. Father denied current drug use but acknowledged using cocaine about three months earlier and methamphetamine about five months earlier. He used drugs on four or five occasions in 2020 while at work or at parties, but never at home or around Minors. Mother and Father denied knowledge of one another's drug use.

In follow-up interviews, Mother and Father sought to retract some of their admissions. Mother stated that although she was previously addicted to methamphetamine, she did not relapse in 2020—she was only drinking. Mother suggested J.F.'s meconium may have tested positive for amphetamines because she took two pills a neighbor told her were sleeping pills. Father claimed he did not know "what he was talking about" during the initial interview because he was not in his right mind, having mixed alcohol with pain medication.

In April 2021, a health care provider notified the Department that J.F. missed an appointment to monitor for a possible serious health condition. Mother tested positive for methamphetamine use around the same time. Father tested negative for all substances.

The Department filed a juvenile dependency petition alleging Minors were at substantial risk of serious physical harm based on Mother's substance abuse, including while pregnant with J.F., and Father's history of drug use. The juvenile court sustained the petition and assumed jurisdiction over Minors in June 2021.

3

The juvenile court held a disposition hearing in August 2021 and ordered Minors removed from Mother and Father. The juvenile court ordered monitored visitation and services for both parents. Mother's case plan included a parenting program, individual counseling, a six-month substance abuse program with after-care, random or on-demand testing, and a 12-step program. Father's case plan included a parenting program, individual counseling, six months of random or on-demand drug testing, and a full rehabilitation program if any test was missed or "dirty." As of August 2021, Mother and Father were visiting Minors for one hour per week, Mother was enrolled in parenting and substance abuse programs, and Father was enrolled in a parenting program.

### B. Reunification Period

Prior to the six-month review hearing in April 2022, the juvenile court ordered the Department to assess, among other things, whether Minors' caregiver or a human services aide could monitor Father's visits. He expressed concern that his visits were "repeatedly being canceled at the last minute."

In a report filed that same month, the Department stated that, as of March 2022, Mother and Father were scheduled to visit Minors for three hours every Wednesday and Thursday. Mother and Father saw J.F. and F.F. only seven times between August 2021 and February 2022, however. Apart from Father canceling one visit due to an emergency, the report does not reveal the reason for the missed visits.

Mother completed a parenting program and enrolled in a substance abuse program, but she failed to provide proof of enrollment in a 12-step program or individual counseling and

4

tested positive for methamphetamine in early December 2021. Mother told a Department social worker she relapsed because "she was sad due to not having her family."

Father told a Department social worker he had not enrolled in any court-ordered programs because a social worker previously assigned to the case "was not providing visitation." But Father later produced documents indicating he had completed a parenting and anger management program and had begun individual counseling in March 2022. Father had two negative drug tests, but he was a "no show" for 13.

At the six-month review hearing, the Department and counsel for Minors recommended six more months of family reunification services. Mother and Father submitted on this recommendation, with Father asking the court "that an effort be made for monitored visits to take place on Saturdays, perhaps even just once a month." The juvenile court continued reunification services and ordered the Department to attempt to find a monitor for weekend visits.

A few months after the six-month review hearing, the Department reported Mother and Father were "inconsistent" with their visits. Between April and September 2022, Mother attended 18 visits with Minors, five visits were canceled due to illness, and Mother failed to show up for nine visits. Father attended 14 visits and did not show up for eight visits. The Department "accommodat[ed] . . . the parents' schedule on multiple occasions," including by making "weekly weekend and after[-]hour accommodations for [F]ather." Both parents were "loving and caring" toward Minors during visits—feeding them, changing diapers, and playing with them.

Mother continued to attend a substance abuse program, but she missed three out of nine individual counseling sessions and was unable to provide verification of her participation in a 12-step program. Mother was a no show for a dozen drug tests between March and October 2022, although she did have five negative tests during this period.

Father continued to attend a parenting and anger management program and attended 20 individual counseling sessions. He missed six drug tests and had five negative tests between April and September 2022.

In subsequent reports, the Department indicated Mother and Father continued to visit Minors, but some visits were canceled by the parents, some were canceled due to illness, and some were canceled due to miscommunication. Mother tested negative for drugs once per month between September and November 2022, but she also missed several tests. Father continued to test negative and miss tests in roughly equal measure. He continued to participate in a parenting and anger management program and in individual counseling.

The juvenile court terminated family reunification services in December 2022.

C.    *Father's Changed Circumstances Petition and Termination of Parental Rights*

The Department filed several reports prior to the July 2023 permanency planning hearing. With respect to visitation, the Department reported Mother and Father attended nearly all of their twice-weekly visits with Minors, though there had been some confusion with monitors rescheduling or canceling visits.

A human services aide who monitored visits reported "the parents give the children all their attention and the children enjoy being with their father and mother. . . . [H]e ha[d] observed the family bond, communicate, and show compassion. [He] ha[d] not observed anything negative and the parents [were] always prepared by arriving to the visits with toys and gifts for the kids to have a good time." Minors "seem[ed] to know who their parents are" and would "run toward their parents and seek to be embraced by [them]." "Overall, [the aide] ha[d] observed the family happy, comfortable[,] and appear loving toward one another."

A Department social worker reported the parents "appear[ed] loving and caring toward the children," "feeding them when appropriate and changing their diaper[s]." Although "both the children and parents appear[ed] to enjoy their time together," the social worker believed "there appear[ed] to be a broken attachment between the children and their parents." Specifically, "on multiple occasions the children sought attention and physical proximity with th[e] [social worker], whom they seldom [saw], instead of their parents." Minors' caregivers told a social worker that F.F. said "[he] did not want to see [Father] any[ ]more and gave the impression that he was afraid of [Father]" following one visit.

The Department reported Minors were "flourishing" in foster care and "ha[d] developed a strong attachment with their current caregivers . . . ." The foster parents intended to adopt the children.

Before the permanency planning hearing in July 2023, Father filed a Welfare and Institutions Code section 388 changed circumstances petition to reinstate reunification services or

return Minors to his care.[2]  Father argued he had completed the individual counseling portion of his case plan, he continued to attend AA meetings, and he provided 13 negative drug tests after the juvenile court terminated reunification services in December 2022.  Father also emphasized his recent consistent visitation and the positive accounts of these visits.

The juvenile court denied Father's changed circumstances petition without a hearing.  The court explained Father failed to make a prima facie showing that circumstances had changed (as opposed to being in the process of changing) or that Father's requested relief was in Minors' best interest.

At the permanency planning hearing, Mother and Father argued the juvenile court should apply the parental benefit exception to forgo terminating their parental rights.  Minors' attorney and the Department argued the exception was inapplicable and recommended terminating Mother and Father's parental rights to permit Minors to be adopted.  In so arguing, the Department contended none of the exception's elements were satisfied.  Minors' attorney, on the other hand, conceded two of the three elements of the exception were arguably satisfied (the parents had visited consistently and there was evidence of a beneficial relationship with Minors) but argued the third was not because terminating the relationship would not be detrimental to Minors.

The juvenile court terminated Mother and Father's parental rights.  The court determined the parental benefit exception did not apply, "focus[ing] . . . on the third prong."

[2]     Undesignated statutory references that follow are to the Welfare and Institutions Code.

8

Specifically, the court believed "the real question . . . is whether the relationship is substantial enough that terminating the attachment would be detrimental when balanced against the benefits of adoption." The juvenile court emphasized F.F. had spent about half his life and J.F. nearly all her life outside of Mother and Father's care. Additionally, there was "no evidence . . . that the children [were] difficult after the visits, that they're constantly asking when they're going to be seeing their biological parents." Similarly, there was "no evidence" that they were not "on track developmentally" or that they "[did] not feel at home in their current placement."

## II. DISCUSSION

Several of the issues raised in Father's opening brief, including his arguments that the Department did not provide visitation and that the juvenile court should not have removed Minors from his custody or should have returned them to his custody, are untimely because they address status review hearing orders that needed to have been challenged earlier. The two issues he briefs that are timely raised—the juvenile court's denial of his changed circumstances petition and its order terminating parental rights—both lack merit.

Even assuming Father made a prima facie showing of changed circumstances, he did not show returning Minors to his custody or resuming reunification services would be in their best interest—indeed, he advances no argument to the contrary on appeal. As for the parental rights termination order, Father (joined by Mother) contests issues that did not serve as the basis for the juvenile court's order: consistent visitation and the existence of a beneficial relationship with Minors. The failure to

challenge the basis of the order made operates as a forfeiture, and, in any event, the court did not exceed the bounds of reason in finding that terminating the parental relationship would not be detrimental to Minors when balanced against the benefits of the prospective adoptive home.

> A.    *Father's Challenges to Status Review Hearing Orders Are Untimely*

Father argues that because "[the Department] and the caregivers knowingly and intentionally denied [Father] visitation, . . . the [j]uvenile [c]ourt's finding cannot stand," but he does not identify the defective finding.  His remark that the Department "failed to provide essential and reasonable services to [Father]" suggests he disputes the juvenile court's findings that reasonable services were provided at status review hearings in April and December 2022.  Any challenge to these findings, however, is untimely.  (*In re Isaiah W.* (2016) 1 Cal.5th 1, 10 ["'An appeal from the most recent order in a dependency matter may not challenge earlier orders for which the time for filing an appeal has passed'"].)  Father's contentions that the juvenile court "violated [his] right to retain the care of his children and have custody of them" and "abused its discretion by not returni[ng] custody of [Minors] to [him]" are likewise untimely to the extent that they challenge the juvenile court's disposition order or status review hearing orders issued in 2022.

10

*B.    There Was No Error in Finding That Granting Father's Changed Circumstances Petition Was Not in Minors' Best Interests*

*1.    Legal framework*

"Section 388 accords a parent the right to petition the juvenile court for modification of any of its orders based upon changed circumstances or new evidence.  [Citations.]  To obtain the requested modification, the parent must demonstrate both a change of circumstance or new evidence, and that the proposed change is in the best interests of the child.  [Citations.]  [¶] . . . [¶] To obtain an evidentiary hearing on a section 388 petition, a parent must make a prima facie showing that circumstances have changed since the prior court order, *and* that the proposed change will be in the best interests of the child.  [Citations.]" (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478, fn. omitted, emphasis added.)  Where, as here, reunification services have been terminated, "the parents' interest in the care, custody and companionship of the child are no longer paramount" and a court considering the child's best interest in the context of a section 388 petition "must recognize this shift of focus . . . ." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; accord *Alayah J.*, *supra*, at 478; *In re K.L.* (2016) 248 Cal.App.4th 52, 62.)

In deciding whether a prima facie showing has been made, a juvenile court "may consider the entire factual and procedural history of the case." (*In re Daniel F.* (2021) 64 Cal.App.5th 701, 711.)  We review the summary denial of a section 388 petition for abuse of discretion.  (*In re Samuel A.* (2020) 55 Cal.App.5th 1, 7; *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.)

11

## 2. Analysis

Father's argument that the juvenile court erred in summarily denying his petition focuses exclusively on the question of whether circumstances had changed. By failing to present any reasoned argument regarding Minors' best interest, Father has forfeited his challenge to that aspect of the juvenile court's ruling. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125). That forfeiture is alone sufficient to reject his assignment of error.

Even if the point were not forfeited, there would be no basis to disturb the juvenile court's ruling. Under the more parent-advantageous approach described in *In re Amber M.* (2002) 103 Cal.App.4th 681, the juvenile court acted within its discretion. Minors were placed in foster care when J.F. was just over one month old and F.F. still less than 18 months old. Father filed his changed circumstances petition more than two years later. Minors had developed a strong attachment to their caregivers in the interim, and although Minors appeared to enjoy visits with Father, there was no evidence that they were impacted by their separation from him.

## C. The Juvenile Court Did Not Err in Terminating Parental Rights

### 1. Legal framework

When a parent is unable to remedy the issues giving rise to dependency jurisdiction, the juvenile court holds a hearing under section 366.26 to determine "whether to terminate parental rights, making way for adoption, or to maintain parental rights and select another permanent plan." (*In re Caden C.* (2021) 11 Cal.5th 614, 625.) "To ease the court's difficult task in making

12

this important decision, the statute provides a carefully calibrated process.  Even if a court finds by clear and convincing evidence that the child is likely to be adopted, the parent may avoid termination of parental rights by establishing at least one of a series of enumerated exceptions."  (*Ibid.*)

One of these exceptions, set forth at section 366.26, subdivision (c)(1)(B)(i), is the parental benefit exception.  A parent proves the exception applies by satisfying three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at 631.)  Only the third element is really at issue in this appeal.

Analyzing whether terminating a parental relationship would be detrimental to a child requires the juvenile court to determine "whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.'  [Citation.]  'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights.  [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at 633, citing *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  Relevant factual determinations include "the specific features of the child's relationship with the parent and the harm that would come from losing those specific features," "how harmful in total that loss would be," and "for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms."  (*Caden C.*, *supra*, at

13

640.)  Our review of a juvenile court determination on this score is for abuse of discretion.  (*Ibid*.)

###### 2.  *Analysis*

Father's discussion of the parental benefit exception in his opening brief, which Mother joins, conspicuously addresses only visitation and the existence of a beneficial relationship.  But these are only two of the three elements that must be satisfied for the exception to apply.  Indeed, the juvenile court assumed these elements were satisfied, emphasizing it was "focus[ing] . . . on the third prong" and deciding what it thought was "the real question," namely, whether the relationship is substantial enough that terminating the attachment would be detrimental when balanced against the benefits of adoption.  The failure to challenge the basis of the juvenile court's ruling again forfeits the issue.

Even putting aside the forfeiture for the sake of argument, the juvenile court's analysis was not an abuse of its discretion.  The court balanced Minors' relationship with Mother and Father against countervailing considerations—principally the amount of time Minors had already spent in foster care (more than two years), their attachment to their prospective adoptive parents, and the lack of evidence that Minors suffered any degree of separation anxiety, even after visits with Mother and Father.  In light of the strong evidence that Minors were thriving in their prospective adoptive placement and the lack of evidence that they suffered significant detriment from their separation from Mother and Father, the juvenile court did not exceed the bounds of reason in finding the parents had not proven the parental benefit exception applicable.

14

DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P. J.

We concur:

MOOR, J.

LEE, J.[*]

---

[*]     Judge of the San Bernardino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.